### JOHN H. REID *v.* ANDREW BURNS.

The plaintiff caused the title to his homestead and residence to be conveyed to his son, in consideration that the son would live on the premises and support him during life, allowing him certain privileges in the house and on the premises, particularly specified in the contract between them; and the son thereupon executed to the father a life lease of the premises, and moved upon the place, and continued to live with the father, in pursuance of such arrangement, a few months; and then left the premises, abandoned the contract, and refused further to perform it, and sold his interest in the place to one having constructive and presumptive notice of the father's rights. Held:

1. As against the son, the father is entitled to a rescission of the contract, and a re-conveyance of the premises.

2. As against the purchaser from the son, his purchasing under circumstances reasonably sufficient to apprize him of the father's equities, entitles the father to a re-conveyance against him.

ERROR to the district court of Wood county.

On the 22d of November, 1858, Andrew Burns filed his petition, in the court of common pleas of Wood county, against John H. Reid and Norman Burns, stating that the plaintiff and said Norman had entered into a contract, of which the following is a copy:

" This agreement, made and entered into this 26th day of December, A. D. 1857, by and between Andrew Burns and Norman Burns of Perrysburg, witnesseth, that the said Norman Burns, for a valuable consideration received of the said Andrew Burns, agrees to and with the said Andrew Burns to keep and provide for him, the said Andrew, during his natural life, and furnish him during all the time with a good comfortable bed, boarding, and nurse during his sickness, also with medical aid and attendance; that he will carefully provide for all the wants of the said Andrew Burns suitable to his age and degree in life, without fraud or stint; that said Andrew is to have the privilege to select his own nurse, in case he deems it necessary to the cure of him in sickness; and said Norman hereby binds himself to treat the said Andrew kindly and affectionately, and give him the right to take such fruit as he may want from the five rows on the north side of the orchard; and to provide necessary fuel, to keep the east room warm, for the use of the said Andrew. 'And the said Andrew, on his part, agrees to assist the said Norman in all his business matters, as far as his health and ability will permit, in addition to what he has heretofore given him. In witness of which, we hereunto set our hands and seals, this 9th day of January, A. D. 1858.

" Signed, sealed and delivered in presence of Asher Cook.  NORMAN BURNS, [SEAL.]  ANDREW BURNS." [SEAL.]

The petition further states, that the consideration of the support to be afforded by said Norman, was that the plaintiff had agreed to cause the title of his house and lot in Perrysburg to be conveyed to said Norman, and that the plaintiff caused the conveyance to be made accordingly, with the express agreement that Norman should hold the title in trust for the plaintiff, as security for the faithful performance of said agreement; said premises being four and a half acres of land, with the dwelling-house and other improvements thereon, in Perrysburg, in said county. The petition further states that Norman, in order to carry out his part of the

agreement, came into possession of the premises, and continued in possession, as contemplated by the agreement, from January until the 20th day of September, 1858, when he abandoned the plaintiff, and removed from the premises, and refused to further comply with or perform his part of the contract; and left the plaintiff in possession of the premises; whereby the plaintiff insists that said Norman forfeited all rights, under the contract, to the property. The petition further states that Norman, in fraud of the rights of the plaintiff, after having abandoned the contract and left the place, for an inadequate consideration, conveyed the same to John H. Reid, who received his deed of conveyance, with full notice of the premises; and that said Norman has no property, real or personal, subject to execution, or sufficient to pay his debts, which was well known to Reid, who received the conveyance from Norman in fraud of the plaintiff's rights. The plaintiff prays that said agreement between him and Norman be rescinded, and that Reid be ordered to convey the property to the plaintiff, etc.

Reid answers, admitting his purchase from Norman Burns, and stating that before the purchase, he examined the title, and found a deed on record from Norman to the plaintiff, conveying to the latter a life estate in the premises; that he knew that the plaintiff was in possession of the premises, and that he had a right to the possession under said deed from Norman to him, and that he, Reid, purchased subject to the plaintiff's life estate; but that he did not know that the plaintiff had any other rights or interest in the premises than those vested in him under said deed conveying to him a life estate. As to the consideration, Reid answers that it is difficult for him to tell whether it is adequate or not, as he purchased subject to the life estate, and that time alone would determine whether he gave too much or too little for the premises. Reid further denies, upon information and belief, that the plaintiff furnished to Norman the money to buy the premises.

Norman Burns answers, that if he ever signed the contract to maintain the plaintiff, mentioned in the petition, he did it

through mistake; that he only signed one paper writing, and that was, as he supposed, a deed conveying to the plaintiff a life estate in the premises; that the plaintiff did not furnish the money paid for the land, but that the money was obtained by the plaintiff from the sale of fish, and by him paid over, as the respondents share, as a partner in the business; that when he sold and conveyed the premises to Reid, he informed him that they were unincumbered except with the life estate of the plaintiff; and that he conveyed the premises to Reid, subject to the plaintiff's life estate, as he had a right to do.

The case was appealed to the district court, and therein came to trial at the July term, 1859; and the court found that the plaintiff furnished the money with which Norman bought the premises, and that Norman held the title in trust for the plaintiff; "that is, that the plaintiff had a resulting trust in said premises;" that Reid took his conveyance of the premises in payment of a pre-existing debt, due to him from Norman Burns; that said debt was secured by a chattel mortgage, which is still in full force, on file, the note only having been given up; that Reid purchased the premises without paying a present consideration therefor, and under circumstances which charge him with notice; that Norman Burns has refused to comply with his agreement for the support of the plaintiff, and thereby forfeited all rights which he acquired thereby.

The district court, therefore, annul the contract between Norman and the plaintiff for the support of the latter; declare the conveyance to Norman to be in trust for the plaintiff, and set aside the conveyance from Norman to Reid, and order the latter to convey the interest he acquired from Norman to the plaintiff, or, in default, that the order operate as a conveyance. The court then declare a lien on the premises, in favor of Reid, for the balance due to him from Norman, after exhausting the property covered by the chattel mortgage, and order the sheriff to sell the premises to pay said balance, provided it does not exceed the amount of a fifty dollar note, mentioned in the mortgage, and interest, but requires Reid to proceed within a reasonable time to

make the money under his chattel mortgage, before he is allowed the benefit of the lien thus given him by the court; and directs that if, by Reid's neglect, his mortgage security should become impaired, that the loss should be his own. And directs Norman Burns to pay the costs.

Reid moved for a new trial, but upon what grounds the record does not show. The motion was overruled by the court, and Reid excepted " to all of which rulings and over-rulings." And a bill of exceptions containing all the evidence was signed, and made a part of the record.

To reverse the judgment and order of the district court, Reid filed a petition in error in this court, and claims " that the case made in the petition is not supported by the findings in the decree; that the findings in the decree are not supported by the evidence; that the evidence is not sufficient to support the judgment; and, finally, that from the evidence, as disclosed in the bill of exceptions, the plaintiff entirely failed to make out any case against Reid, and that, in failing to dismiss the petition, the court below erred." A sufficient statement of the evidence appears in the opinion of the court.

*James Murray*, for plaintiff in error.

*Asher Cook*, for defendant in error.

SUTLIFF, C. J.—The evidence as set forth in the bill of exceptions is too voluminous to be fully embraced in a statement of the case; nor is it necessary in order to present the material points of the case.

The plaintiff testified on the hearing, that the contract exhibited in court and set forth in the petition, was executed between him and his son Norman; that for a long time the premises had been the residence and homestead of the plaintiff, but that the title was held by his son Andrew, jr.; that a creditor having obtained a judgment against him for a few hundred dollars, filed a petition to subject the property to the payment of the debt; that he employed the said Reid, who was an attorney, residing in the town, to attend to his

interests in the case; that Reid, as his attorney, undertook
to conduct his defense, or to attend to his interests in relation
to the suit; that Reid had always since 1853, been his attor-
ney; that he drew his answer in that case, and that he always
regarded Reid as his attorney, and continued to advise with
him as such, during the pendency of the suit; but that be-
fore the final hearing, Reid said that he was about to leave
town, and proposed to have Mr. Cook associated with him in
the case, and that plaintiff consented to the arrangement,
but did not regard Reid as withdrawing from the case. But
it was admitted by the plaintiff, that in July, 1856, he had a
settlement with Reid, and obtained his receipt in full of all
charges up to that date. In relation to that suit, he also tes-
tified that it was agreed, upon the advice of Cook, that the
plaintiff should permit the lot of ground to be sold at sheriff's
sale, and furnish the money to buy it in; that he thereupon
repaired to his fishery, and as a fisherman, earned and pro-
cured the money and carried it to Cook, who bid off the land,
and therewith paid the sheriff the purchase money, and had
a deed taken in the name of his son Norman, in accordance
with his agreement to furnish a support for the plaintiff upon
the place during his life. That Norman paid nothing, and
had no demands against the plaintiff or any claim on the land,
except by virtue of his contract. The only object of the
conveyance to him being to give effect to the contract for
plaintiff's maintenance, and to secure to Norman the place,
in consideration of his so furnishing a life support for the
plaintiff upon the place, according to the terms of said agree-
ment; that the value of the lot was from $1000 to $1500,
and he would not have sold at less than $1000. That Norman
moved into the house, and for a few months lived with the
plaintiff, but furnished no support for the plaintiff, but re-
ceived his own support and that of his family from the plain-
tiff's supplies; and then moved from the place, and took
away about $400 worth of the plaintiff's property, without
his knowledge or consent, and for which he had paid nothing;
and that Norman has ever since neglected and refused to
contribute anything to the support of the plaintiff; but that

the plaintiff has ever since continued to live upon the place and support himself; that shortly after Norman left him, he met Reid in town, and that Reid told him he had bought the place of Norman; and that thereupon he told Reid that Norman had no right to sell, and that he had not kept his contract with the plaintiff; that he understood Reid to say, in reply, that Norman had told him that they had differed, but that he had bought Norman's interest to secure a note or to get his pay on a note he held against Norman; that Reid was well acquainted with his and Norman's circumstances, and must have known that Norman had violated his contract in relation to the property. The plaintiff testified that he was sixty-four years of age; that Norman was possessed of no means with which to pay for land.

G. Webb, the clerk, testified that Andrew Burns arranged with him to settle and satisfy his costs.

Andrew Burns, jr., son of the plaintiff, and brother of Norman, testified that his father owned a fishery, and carried it on himself, from which he obtained the money to buy in the place; that he was living with his father at the time on the premises.

Norman Burns testified, that he sold his interest in the lot to Reid, in consideration of a note of $50, held against him by Reid; that Reid drew the deed for him to sign, and he signed it, and Reid gave him up the note; that he helped his father at the fishery, by which the money was procured to buy in the land; that his father wanted the writing fixed, so that he, Norman, should have the land after his lifetime, but that he would not have it so; that it was finally agreed how Mr. Cook should make the writings, and the sheriff's deed was made to him. In relation to his agreement to support his father, he says: "I do n't remember anything about the written agreement, that I should support the old man. 1 do n't think it was read to me if I signed it. I was to support him and to have a good deed for the place. After the agreement I moved on the place with the old man, but I had moved away before selling out to Mr. Reid my interest or right in the place."

John H. Reid testified, that he had sold Norman a horse for $50, and taken his note some time previous, and taken a chattel mortgage upon the horse for security, and also upon another horse to secure that note and another note of $40, held against him; that afterward Norman told him he could not well pay him for the horse, and wished to sell him his interest in the lot of land. Witness says: " He told me how the title was—that he had the sheriff's deed, and had given his father a deed for his life estate. I did not want the land, but he offered to sell me the place for his note of $50, which I held against him, and urged me to buy it at that price. He told me that he and his father had had a difficulty, and that he had left the place. I had been the old man's attorney for several years, but was not at that time. I commenced doing business for the old man in 1853, and was employed by him as his attorney, down to July, 1856, when I had a settlement with him and gave him a receipt July 8, 1856, and have never considered myself as his attorney since that time. I was the old man's attorney in that suit in which the lot was decreed to be sold, and was sold as stated. I drew his answer, but after Mr. Cook of this place, returned from Europe, as I was about leaving town, Mr. Burns told me that he wanted to employ Mr. Cook, and I consented to it. I talked with Mr. Cook, in relation to the suit, but did not, after he was employed, regard myself as longer being the old man's attorney in the case. Norman spoke to me at different times to buy the lot. I went and examined the records and found there his sheriff's deed, and the old man's life estate deed duly recorded. I also looked at the records in the clerk's office, to find out about the title before buying; and becoming satisfied, on the 28th day of September, 1858, I concluded, at his request, to purchase, and gave up to Norman his note of $50, and accepted his deed. It was all he asked for the place, and all I considered it worth. And I would not have bought it at that price, if I had not become satisfied that I should otherwise have to take back the horse in order to get my pay. * * * I do not want the property, and would not have bought it at that price, but for the reason mentioned."

Reid further says, that he did not call upon the old man nor upon Mr. Cook, to inquire in relation to the title.

Asher Cook testifies that he returned from Europe in August, 1856, and shortly after was spoken to by both Reid and Burns about the suit in which the old man's lands were sold; could not tell which spoke to him first; considered himself employed to assist Reid, and upon consulting Reid thought the only thing to be done was to get delay; that the matter was finally compromised, and a decree taken to sell the land to pay the amount; that the old man furnished the money to buy in the land; that Norman and the old man were at his office at different times, in relation to the business; that Norman never pretended to have any claim or interest in the land; that the consultation was in relation to the title—how it should be held; and that it was finally agreed that for the consideration of his furnishing a support for his father through life, the lands should go to him, Norman; and the agreement was written accordingly, and signed by them; and the deed was thereupon made by the sheriff to Norman; and also a life lease of the place made to the old man to secure him his home there, with the understanding that Norman should live with him upon the place.

The sheriff testified that Cook paid him the money, and directed the deed to be made to Norman.

The witnesses differ as to the value of the premises.

A. M. Thompson estimates the value at from $500 to $600, and at $200 or $300 less, subject to the plaintiff's life estate.

S. D. Westcott, a merchant in that town, estimates the premises, subject to the plaintiff's life estate, at from $300 to $400.

The defendants' witnesses fix even lower estimates.

Mr. Jefferson thinks the premises worth about $500, free of incumbrance; and subject to the plaintiff's life estate, from $100 to $300.

Mr. Bates thinks the premises, subject to the life estate, worth from $200 to $300.

Gilbert Beach regards it worth $500, free of incumbrance;

and, subject to the incumbrance of the plaintiff's life estate, $100.

The foregoing is all the evidence given by the parties as to the value of the premises.

Other witnesses testified as to the length of time the plaintiff had lived on the place; his responsibility; the want of responsibility of Norman, and as to the furnishing the money; but it is unnecessary to recite this testimony more at length, as it would not change the complexion of the case.

Sufficient of the evidence has been set forth to fairly present for consideration the only questions of importance arising upon the record.

While it is assigned as a cause of error by counsel for plaintiff in error, that the plaintiff below " failed to make out any case against Reid," it is not assigned, nor claimed by counsel, that the proof did not very clearly make a case for relief against Norman. The weight of evidence, as set forth in the record, is such as to leave no doubt in the mind of any one as to the facts of the plaintiff below being the equitable owner of the lot at the time the title was, by the sheriff's deed, conveyed to Norman; and that it would have been competent for the father to have had the title conveyed to himself, or to his other son, or any other third person whom he might have designated. The proof upon this point is simply to the effect that the plaintiff below, who had long resided upon the premises, and had improved and occupied them as a homestead, had always been regarded, and was in fact the owner of the premises, but that for some reason, he had the title, previous to the sheriff's sale, held by his son Andrew, jr.; and that upon the lot being exposed to sale under a decree of the court to satisfy a debt of the father, he had, by the advice of his counsel, furnished to them, or one of them, money with which to buy in the land, for the purpose of securing it to himself; and that by a mutual agreement, under the advice, or with the aid of counsel, in consideration of a life support to be afforded him upon the premises, with certain privileges of rooms, fruit trees, etc., as expressed in

the written contract, the title of the premises was, by the sheriff's deed, conveyed to his son Norman in fee.   That the title was so conveyed to Norman for the sole consideration, and in full confidence that he would faithfully execute his part of the agreement, in providing a maintenance and life support for his father upon said premises.   That to secure his maintenance upon the place, Norman executed, at the same time, a life lease of the place, to the father, and executed to him his written obligation to furnish such support; and that he moved into the house with his father, in accordance with their agreement, and for a time received his own support, and, perhaps, ministered somewhat to the support of his father; but the proof does not show that Norman ever, for any time, furnished a support for his father in the manner required by his contract.

The petition, however, makes no charge of delinquency against him while continuing to stay with him upon the place.   As between himself and Norman, the plaintiff below, in his petition, relies upon the facts of Norman having neglected and refused the performance of the contract on his part, having left the premises, with the express intention of affording no further support to the plaintiff, together with the insolvency of Norman, as a just cause for rescinding the contract.

It is not denied that the averments in the petition, and the proof of the facts mentioned, clearly entitle the plaintiff to relief; but it is insisted that the facts do not authorize the court to decree a rescission of the contract, and a conveyance of the premises even as between the plaintiff and Norman.

The rescission, cancellation, or delivery up of agreements, securities, or deeds, is said to be one of the heads of equity jurisdiction indispensable to reciprocal justice.   It is the converse of a specific performance.   The ground for the equitable relief, in either case, is the same.   The equity arises from the fraud which the circumstances of the case show would be perpetrated, but for such interposition of the court, upon the party asking such relief.   In neither case

can the relief be claimed by the party as his strict right; but in both cases, an application for specific performance, and an application for a rescission of a contract, or reconveyance of lands, securities, etc., the relief asked is granted or refused by a court of equity upon its own conclusions, from all the attending circumstances, that the relief is or is not just and reasonable in the particular case. It is said, too, that the plaintiff will be expected, in a court of equity, in such cases, to show himself entitled to relief beyond a mere technical breach of duty. The court will also, in some cases, order an indenture to be canceled or annulled, on the application of one party, when it would refuse similar relief on the application of another—showing very clearly that the court, in such cases, has an ample discretion. And still the discretion exercised upon such applications by courts of equity is not an arbitrary discretion, but it is said to be, "a sound and reasonable discretion, and regulated upon grounds that make it judicial." The court, however, often considers before granting it, whether the relief prayed would be attended with hardship or not; or whether a superior or inferior equity arises on the part of the applicant. See Story's Equity, sec. 692, *et seq.*; and Willard's Eq. Jurisp. 302, *et seq.*

While it must be admitted that there is a remarkable dearth of reported cases upon the. subject of rescission of contracts, and reconveyances of lands, the authorities referred to, and other elementary writers very clearly show that it is only the exercise of the same power, by the court, to decree a rescission or reconveyance, that it is to decree a specific performance. In a proper case a court of equity has the power to grant either form of relief; and without a proper case, the court will grant neither.

In the case of *Tracy* v. *Sacket*, 1 Ohio St. Rep. 54, this court ordered a rescission of the contract, after a substantial performance, on the part of the grantee, during a period of nearly two years; and ordered a reconveyance of the land. The court say in that case: " To maintain this contract on the part of Tracy, in a court of equity, even if divested of

all circumstances of fraud and imposition, would require of him the utmost good faith in the making the contract, and a strict performance, characterized by a benevolent regard for the welfare of those who were committed to his charge."

In that case, like this, an old man had conveyed all his real estate, by deed, to another for the consideration of a life maintenance to be furnished himself and his wife. But the grantee of the lands in that case, neither refused nor neglected to furnish their maintenance, but the court found " the provisions furnished by Tracy, for their support, were supplied in small quanties at a time; and  *  *  *  * that the supply was at times wholly insufficient"—yet the court, in that case, set aside the conveyance, and rescinded the contract.

How, then, stood the present case as between the plaintiff below and Norman Burns; and was the case as presented in the district court by the plaintiff below, a proper case for the relief, a rescission of the contract between him and his son, and a reconveyance of the property by Norman to his father?

The finding of the court that all the purchase money to buy in the title to his homestead property was paid by the father, is not, and can not be, seriously questioned. The proof, as set forth in the record, very clearly establishes that fact; as it does the further fact that the consideration for the conveyance of the lot to Norman, consisted in his undertaking to furnish a life maintenance to his father, upon the place, according to the terms of the contract entered into by the parties. And the record shows, both by the answer and testimony of Norman, that after moving into his father's house, and living with him, from some time in January, 1858, until in September of the same year, he removed from the place, leaving his father upon the premises, and repudiating the contract.

The decree, it is true, in the case of *Sacket* v. *Tracy*, does not appear to have been predicated upon any special finding of the facts. But there is nothing in the statement of the case, as reported, intimating that the decree was made upon proof of incompetency on the part of Sacket to contract, or

any fraud or imposition on the part of Tracy; nor do the circumstances of the case, the relation of the parties, or the value of the property, conveyed to Tracy by Sacket, for the maintenance, show any undue advantage obtained by Tracy in the contract. It seems, from the statement of the case, that Sacket, a revolutionary soldier some eighty years of age, and of intemperate habits, on his part conveyed to Tracy eighty acres of land, on which he then lived, and between $300 and $400 worth of personal property, together with his pension of $96, yearly; and Tracy, in consideration, bound himself to provide the said Sacket and his wife " with food and raiment, and everything necessary to their very comfortable existence and support, during their natural lives," etc. And yet, in that case, after nearly two years' performance on the part of Tracy, and full performance by Sacket, the contract was rescinded.

In the present case, the record shows no proof or pretense on the part of Norman, that he has made any substantial improvements on the lot, nor that a rescission of the contract would in the slightest degree be to his prejudice, further thar to place both parties in the *statu quo* respectively occupied by them before such contract was made. Indeed, Norman is shown by the record to have been willing to convey away all claim to the place to a stranger for the small sum of fifty dollars; and to remove from the place even before selling. He could not then, even if he held the title, say that the reconveyance of the place would work him an irreparable injury. And, repudiating the contract, as he does, in an action at law, he would be liable to refund to his father the value of what he had received under the contract, even if he had entered into or signed it, as he swears he did, by mistake—there is, then, no special objection urged on the part of Norman to a rescission and reconveyance.

What claim does the record show that the plaintiff presented to the court for the specific relief granted him in the case?

The plaintiff was an old man, having several sons; at least one other son, who previously held the title, and who was a witness on the trial. The place had long been his home:

and the contract presented by the record, shows that it was particularly stipulated by the old man, that he should have his support upon the premises, and have possession of a particular room in the house, and other privileges mentioned; and without which, it may well be imagined, he would have turned to his other son, or at least have refused to suffer the title of the lot to have been taken by Norman. And there is no evidence to contradict the testimony of the old man, that Norman really furnished no supplies for him while enjoying the use of the premises with him, but it appears that Norman in fact took several hundred dollars' worth of property from him while on the place, and when he left. Again, the record shows that Norman has no property or means wherewith to pay anything to his father as damages. Nor would money compensate the plaintiff for the deprivation, in his old age. of the home of his earlier days. The trees which had been planted, and the buildings and improvements which had been made by his own industry upon the place, and added from year to year, conformable to his own peculiar tastes, and his long and familiar associations with them, it may well be imagined, had rendered that place a more congenial home to him, and more conducive to his enjoyment in old age, than any other would be within his power to procure.

The old gentleman had the right to stipulate, as he did in the contract, for the enjoyment of a home upon the premises and with one of his sons, and for such a support as is expressed in the contract, for which alone he consented to part with the title to the place. It is against natural justice and good conscience for the son, under such circumstances, to abandon all performance on his part and at the same time refuse to restore the title of the place so received as a consideration and in contemplation of his performance.

I am, under all the circumstances, very clearly of the opinion that the record shows a very proper case for the relief of rescission and reconveyance as against Norman Burns.

The only remaining defense the plaintiff in error can urge to the decree, must be that of an innocent purchaser without notice. And upon this issue the court below found against

him; and that is the error relied upon by his counsel in this case. It is insisted that the evidence did not warrant the district court in finding either actual or constructive notice to Reid of the rights of Andrew Burns in the premises. Let us for a moment recur to the proof upon this point.

In the first place, then, Reid admits he had acted as the old gentleman's attorney from some time in 1853, down to July, 1856; that he was the attorney first employed by him to look to and protect his interest when the land was sought to be charged in the suit, upon the decree under which the land was finally sold; and that he drew the old man's answer in the case. All the proof shows that the old man had the title of his land previous to that time held by another son, Andrew, jr. Reid, in drawing his answer, and advising with him as attorney in the case, must be presumed to have come to know the fact that while the old man was the real owner of the land, he chose to have the legal title held by a son. Indeed, the record shows that the land was, by the suit, sought to be subjected to pay a debt of the old man; and that after drawing the answer and advising with Cook in relation to the case, that Reid expressed the opinion that to obtain delay was all that could be effected for the defense. This was an admission by Reid that from his knowledge of the facts, the lands were liable to be subjected as the old man's property for his debts. Reid also knew that the old man's anxiety to save for himself the lands, had induced him to employ counsel in the case. It is unnecessary to remark upon the difference of understanding between Burns and Reid, as to Reid's continuing to act as attorney in the case. Reid swears he did not regard himself as being attorney after his settlement in July, but he does not say he so informed Burns, nor does he deny that he continued to talk with him and with Cook, as both Burns and Cook swear he did, during the pendency of the suit, after Cook was called in; which must have been in the latter part of August or September. Again, all the evidence shows that Norman was irresponsible, and had no means of paying for the land; and Reid himself testifies to having taken of him a chattel mortgage of the $40 or $50

worth of property he had before sold him on credit; and that
Norman's utter want of responsibility led him to suppose the
collection of the fifty dollar note, even with the chattel mort-
gage, very uncertain; and Reid swears that that apprehension
prompted him to buy the land, which he did not want at that
price, and would not otherwise have bought.   The knowledge
that the old man had the equitable interest in the land, and
that Norman had no means to pay him for it, and that it was
the old man's homestead, highly valued by him, and on which
he was living, is shown from the record to have been well
known to Reid at the time he bought the land from Norman.
And although this of itself, without the reasonable presump-
tion that he knew of the arrangement to put the title into
Norman's hands, might be regarded sufficient notice of the
plaintiff's interests, the proof does not stop here.   Reid
himself testifies that before buying, Norman told him that he
and his father had differed, and that he had left the old man.
And again, that Norman urged him to buy the property, and
only asked him therefor, to surrender his note of $50, as the
price of the four and a half acre lot, with buildings, fruit
trees and other improvements, in the town of Perrysburg.
But it may suffice to say, there is shown by the record suffi-
cient evidence, if not to prove actual notice, certainly to prove
constructive and presumptive notice on the part of Reid of
the old man's equities.   And the relation of the parties, Reid's
acquaintance with them, and their circumstances, and with
the property; and especially his relation of attorney and ad-
viser of the old man in the very suit which resulted in chang-
ing the title from his son Andrew to Norman, require that
the presumptions of knowledge on the part of Reid, unless
clearly and satisfactorily explained away, should have their
full weight.

In the decree as drawn, the court is made to say that they
find that Reid did not pay a present value for the land, but
accepted it in payment of his existing debt of fifty dollars.
But as the court also find he bought with notice, the errone-
ous finding or expression, implying that the note was not a
present value, could not at all affect Reid prejudicially.

6

It is further objected to the decree, that the court made the lands chargeable in the hands of Andrew Burns, after the rescission and reconveyance to him, with the payment of so much of the $50 note due from Norman to Reid as the chattel mortgage shall fail to satisfy. This is an objection, it must be admitted, which if presented by Andrew Burns, might not be so readily answered, and might possibly have required the judgment or decree to be reformed in that particular. But as this alleged error is very clearly in favor of the plaintiff in error, it is not competent for him to make objection to it. It will be in season to consider that objection when presented by a party prejudiced thereby.

From the views thus expressed, I am very clearly of the opinion that there is no error apparent upon the record, of which the plaintiff in error has a right to complain.

It is the opinion of the majority of the court, that the petition in error be dismissed, and the judgment of the district court stand affirmed.

Judgment accordingly.

SCOTT and BRINKERHOFF, JJ., concurred; PECK and GHOLSON, JJ., dissented.