BRICE *vs.* BRICE and others.

R. B. on the 2d of January, 1833, being the owner of a farm of about 130 acres, conveyed the same with the exception of two acres, to his son J. R. B.   The consideration expressed in the deed was $300; and the grant was declared to be subject to the support and maintenance of the grantor and his wife during their lives.   On the same day J. R. B. executed to L. a deed of the farm, similar in all respects to the deed executed by R. B.   On a bill by R. B. praying that J. R. B. and L. might be decreed to release the farm to the plaintiff, and that the conveyances might be declared fraudulent and void, &c., it appeared from the proofs that at the time of the execution of the deed from the plaintiff to J. R. B. the latter had for several years exercised almost unlimited control over the former, and had acted as his general agent, and transacted most of his business; that the plaintiff had become old and feeble, and in the management of his affairs depended on the aid and counsel of his son, who had thereby acquired great and controlling influence over him; that J. R. B. proposed to the plaintiff that he should convey all his property to himself and L. his brother-in-law, reserving to R. B. and his wife a support; that to induce him to comply with their proposal, J. R. B. and L. referred to his present weakness and infirmities—told him that he had become old and foolish—alluded to the evidence of his imbecility in the fact of his having signed papers which he ought not to have signed, and advised him to place his property in the hands of L. as a trustee, and thereby secure a support for himself and his wife.   In consequence of which representations R. B. executed the deed, and J. R. B. and L. became vested with the title to his entire estate, worth from 4 to $6000 over and above the incumbrances, without having paid any consideration whatever, or incurred any liability, beyond a personal covenant to support the grantor and his wife for life.

*Held* that R. B. was induced to execute the conveyance by means of an undue influence exercised over his free will by J. R. B. and L.; and that the case was within the principle and policy which govern courts of equity in avoiding deeds obtained under such circumstances.

*Held also,* that the relation of both child and confidential agent which J. R. B. sustained to the grantor brought the case within the equitable rule that he who bargains in a matter of advantage, with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence.

*Held further,* that L. was not in a situation to claim protection as a bona fide purchaser; it being sufficient that he received his conveyance infected with the undue influence and imposition of his grantor.   That the obligation of restitution followed it into his hands, though he might not be guilty of actual fraud himself.   And *held* that the general rule that in cases of fraud the whole transaction will be undone, and all the parties replaced in their former situation,

would not allow him to avail himself of his own innocence, to protect the property against the person who had been deprived of it by fraud or imposition.

Where a bill is filed to set aside a conveyance, on the ground of undue influence if the facts alleged in the bill are sufficient to justify the inference of undue influence, and the proofs sustain the allegations, relief will not be denied because the plaintiff, in stating his case, has averred that the transaction of which he complains occurred through mistake, or misapprehension, or by fraud and deceit

L. went to R. B., whose son, J. R. B. was in prison under an indictment for perjury, and informed him that he came at the request of his son, and that W would unite with him, L., in becoming bail for J. R. B. if R. B. would give L. a warranty deed of his farm; assuring him that the deed was only for the appearance of J. R. B. at court, and would be given up if he stood his trial. R B. accordingly executed an absolute deed to L., with that understanding. No such deed having, in fact, been required by W., and the pretence of its being necessary, to procure bail for J. R. B. being false; *Held*, on a bill filed by R B. to set aside such deed on the ground of fraud, that the same was improperly obtained, and should be declared void, as between the grantor and grantee.

In order to defend a title on the ground of a bona fide purchase, it must be shown that the purchase was made for a valuable consideration, and without notice of any prior equity.

When a person, other than the vendor, is in possession of land, the purchaser has constructive notice of the rights of the possessor, and takes the land subject to all his equitable claims.

The possession of such third person is sufficient to put the purchaser upon inquiry as to the extent of his rights. And those claiming under the title of such purchaser cannot defend on the ground that he was a bona fide purchaser without notice.

IN EQUITY. This was an appeal by the plaintiff from a decree of the late assistant vice chancellor of the first circuit. The plaintiff, on the second day of January, 1833, was the owner and in possession of a valuable farm in the town of New Scotland in the county of Albany, containing about 130 acres. On that day he conveyed the farm to his son James R. Brice, one of the defendants, "excepting thereout two acres, one granted to Mary Brice and the other to Margaret Brice." The consideration expressed in the deed was $300, and the grant was declared to be "*subject to the support and maintenance of the said Robert Brice and his wife, during their lives and the life of the survivor of them, and that the grantee, his heirs and assigns shall stand seised subject only as aforesaid, and these presents shall be deemed a covenant therefor.*" At the time of the conveyance the farm was encumbered by a mortgage

executed by the plaintiff to the New-York Life Insurance and Trust Company to secure the payment of $1800 and interest from the 12th day of June, 1832; at the same time the deed from the plaintiff to James R. Brice was executed the latter executed to the defendant Sebastian Lewis a deed of the same farm, similar in all respects to the deed executed by the plaintiff.  On the 21st of December, 1833, the plaintiff executed another deed whereby for the consideration of $1000 expressed therein, he conveyed the same farm to the defendant Sebastian Lewis absolutely, with the usual covenants of warranty.  On the 12th day of February, 1834, James R. Brice and Sebastian Lewis executed a deed of one hundred acres of the farm to Sebastian Gunsolus, an uncle of the defendant Lewis.  The consideration of the deed was $3000, and the conveyance was made subject to the mortgage for $1800 to the New-York Life Insurance and Trust Company.  On the 16th of April, 1835, Gunsolus conveyed the same 100 acres which had been conveyed to him, to the defendant Charles Van Eps, by a warranty deed.  Van Eps went into possession under his deed.  James R. Brice was indicted for perjury in December, 1833, and in March, 1834, was convicted and sentenced to the state prison for four years. His sentence expired in March, 1838, when he returned and with the plaintiff took possession of that part of the farm which had not been conveyed to Gunsolus.  They still remain in posssesson.  Gunsolus died in 1842.

The bill in this cause was filed in March, 1844.  It stated that the plaintiff, at the time of the execution of the deeds from him to James R. Brice and from James R. Brice to Sebastian Lewis, being advanced in years and of delicate and infirm health, under the advice of his family and friends, consented and agreed with James R. Brice and Sebastian Lewis to convey his farm and property to them, or one of them, as a trustee or trustees, to be held by him or them in trust to apply faithfully the rents and profits to the support and maintenance of himself and wife during their lives and the life of the survivor of them, subject to his disposal by will or otherwise ; that in pursuance of such agreement the deeds of the 2d of January, 1833, were exe-

cuted, and at the same time Lewis executed a bond to James R. Brice, conditioned to reconvey the farm to him upon request, which bond had been lost or destroyed; and that when the conveyances and bond were executed, the plaintiff supposed they would operate to create the trust which had been agreed upon by the parties. It was charged that the conveyances were executed through mistake or misapprehension of the parties; or if not, that the conveyance was fraudulently obtained from the plaintiff.

The bill further stated that on the 21st day of December, 1833, James R. Brice had been arrested and was then in prison upon a charge of perjury; and that to indemnify Lewis for becoming his bail, or procuring some other person to become such bail, it was agreed that the plaintiff should execute an absolute deed of the farm to Lewis, which deed should be deposited in the hands of James Wands, 2d, to be delivered to Lewis in case James R. Brice should not appear according to the condition of his recognizance; but if his bail should be saved harmless, then the deed should be returned to the plaintiff; that the deed of the 21st of December, 1833, was executed upon this condition and deposited with Wands. It was charged that although the bail of James R. Brice was not damnified, yet that Wands having died, Lewis fraudulently obtained the deed from his representatives and insisted that it was a valid and absolute conveyance of the farm. It was also stated that the deed to Gunsolus, though absolute in form, was intended only as a security for the amount which Gunsolus should advance in payment of the mortgage of $1800, to the New-York Life Insurance and Trust Company. It was also charged in the bill, that when the deed was executed by Gunsolus to Van Eps, the latter was apprized of the rights of the plaintiff; and it was stated that Gunsolus, in his will, had directed his executors, in case the plaintiff's claim to the farm conveyed to Van Eps should be established, to refund to Van Eps the amount of the purchase money he had paid.

The bill waived an answer upon oath, and prayed that James R. Brice and Sebastian Lewis might be decreed to release the farm to the plaintiff, and that the several conveyances mentioned

might be declared fraudulent and void; and also, that certain accounts might be stated with the executors of Gunsolus, who were made defendants; and also with Van Eps, in respect to the rents and profits of the farm, and the payments made upon the mortgage to the New-York Life Insurance and Trust Company, and for general relief.

All the defendants, except James R. Brice, answered together. The answer stated that on the 2d of January, 1833, James R. Brice, claiming to be the owner of the farm, agreed to sell it to Lewis for $3500; of which $300 was to be paid in cash, $200 in a note, $750 in a mortgage to the New-York Life Insurance and Trust Company, to be assumed by Lewis, and the balance, being $2250, was to be paid by discharging debts of James R. Brice to that amount; that when the deed to Lewis was executed by James R. Brice, he paid the $300 in cash, gave his note for $200, which he had subsequently paid, and executed a bond conditioned to pay debts of James R. Brice to the amount of $2250; that when the deed was read to him by J. V. N. Yates, Esq. who prepared the papers to be executed by the parties, he discovered that it contained a covenant for the support of the plaintiff and his wife, and thereupon he refused to accept it, and insisted upon having the bond he had executed, and the note he had given, cancelled, and the money he had paid refunded; that then it was agreed between him and James R. Brice and the plaintiff, that his bond should be destroyed, and that Lewis should proceed to pay the debts, and when paid the plaintiff should execute to him an absolute conveyance of the farm; that the deed of the 21st of December, 1833, was executed in performance of this agreement, and not upon the conditions stated in the bill; that Lewis had paid on account of the farm $4548,11. It was alleged that after the deed was delivered and had been recorded, Lewis left the deed with Wands, as his agent, for the purpose of selling the farm. It was also stated that the conveyance to Gunsolus was absolute, and made with the knowledge and advice of the plaintiff; that James R. Brice joined in the execution of the deed to Gunsolus to satisfy him as to the title, and not because either

he or the plaintiff claimed any interest in the farm; that Gun-
solus paid $3000 for the 100 acres conveyed to him. The
answer further stated, that for some time after the execution
of the deed by the plaintiff, Lewis did provide for his support,
and had always been ready and willing to keep and perform
all the terms and conditions of his deed from which he had not
been released and discharged.

The bill was taken as confessed by the defendant James R.
Brice. A great number of witnesses were examined, but the
facts proved by them will be found sufficiently stated in the
opinion of the court. The cause having been heard upon
pleadings and proofs before the late assistant vice chancellor
of the first circuit, a decree was made by him dismissing the
bill with costs.

*A. Dean & S. H. Hammond,* for the plaintiff.

*H. G. Wheaton & E. A. Doolittle,* for the defendants.

*By the Court,* Harris, P. J. The evidence in this cause
shows that at the time the conveyances of the 2d of January,
1833, were executed, the plaintiff was the owner of a farm
worth from six to eight thousand dollars, and had a consider-
able amount of personal property, consisting of stock, farming
implements, &c. That the only incumbrances upon his farm
were a mortgage which he had a few months previously exe-
cuted to the New-York Life Insurance and Trust Company
for $1800, and, perhaps, a judgment in favor of Mr. Wheaton
for about $300 for a debt of his son James. That for several
years James had exercised almost unlimited control over the
plaintiff; that he had acted as his general agent and transacted
most of his business; that he was accustomed to follow the
suggestions and advice of James with the most implicit confi-
dence. That he had become old and feeble, and in the man-
agement of his affairs depended upon the aid and counsel of
his son, and that thereby James had acquired great and controll-
ing influence over him; that under these circumstances James

formed the purpose of obtaining from his father a conveyance of his property; and to effect that purpose he resolved to call in the aid of his friend and brother-in-law, Sebastian Lewis; . that without disclosing to his father his purpose he went to Broadalbin and brought Lewis home with him; that immediately upon his return the plaintiff was sent for, and the proposition made to him that he should convey all his property to them, reserving to himself and his wife a support. That to induce him to comply with their proposal they referred to his present weakness and infirmities, told him that he had become old and foolish, alluded to the evidence of his imbecility in the fact of his having signed papers which he ought not to have signed, and thus artfully appealing to his fears, and betraying the child-like confidence he reposed in them, they advised him that it would be better for him to place his property in the hands of Lewis as a trustee, and thereby secure a support for himself and his wife. They found him a fit subject to be operated upon by their arts. He readily surrendered himself and his property into their hands, and on the same day or the next, they found themselves vested with the title to his entire estate, worth from four to six thousand dollars over and above the incumbrances, without having paid one cent of consideration, or incurred any liability, beyond a personal covenant to support the plaintiff and his wife during their respective lives. I am entirely satisfied that when the conveyance of the second of January, 1833, was made, the plaintiff was under the overruling influence of his son and Lewis; that the transaction was theirs, not his; that while he, with unsuspecting simplicity, yielded to their suggestions and counsel, they were treacherously contriving how they might most effectually profit by his misplaced confidence. I cannot bring myself to doubt that the plaintiff was induced to execute the conveyance by means of an undue influence exercised over his free will by his son and Lewis, and that the case is clearly within the principle and policy which govern courts of equity in avoiding deeds obtained under such circumstances. The relation of both child and confidential agent, which James R. Brice sustained to the

plaintiff seems to me to bring this case most emphatically within what Lord Eldon called that great rule of the court, that "*he who bargains in a matter of advantage with a person placing confidence in him is bound to show that a reasonable use has been made of that confidence ; a rule applying to trustees, attorneys or any one else.*" The plaintiff believed his son and his son's brother-in-law to be his friends; and believing this, under the consciousness of his own infirmities, he was readily persuaded to do what they advised him would be for his advantage. The language of Justice Woodworth, in delivering the opinion of the court for the correction of errors in *Whelan* v. *Whelan*, (3 *Cowen*, 537,) is forcibly appropriate to such a case. "A contract obtained from one party, so much in the power of the other, cannot be sanctioned if confidence has been abused, if there is inadequacy of price, or the inference is plain that advantage has been taken of age and imbecility, and the partiality of a parent has been artfully made use of to strip him of his property and reduce him to a state of dependence and want."

It was urged upon the argument, on behalf of the defendant Lewis, that though James R. Brice may have imposed upon the credulity of his father, the evidence was not sufficient to involve Lewis in the imposition. I think the proof justifies the conclusion that Lewis himself, with a full knowledge of the purpose of James R. Brice, freely lent himself to their accomplishment, and that ultimately he sought to derive to himself the chief benefit of the fraud he had contributed to practice upon the plaintiff. But however this may be, Lewis is not in a situation to claim protection as a bona fide purchaser, and it is enough that he received the conveyance infected with the undue influence and imposition of him from whom he received it. The obligation of restitution follows it into his hands. Though he may not be guilty of actual fraud himself, the general rule, that in cases of fraud "the whole transaction will be undone and all the parties replaced in their former situation," will not allow him to avail himself of his own innocence to pro-

Brice *v.* Brice.

tect the property against the party who has been deprived of it by fraud or imposition.

But it is insisted that the plaintiff is not entitled to relief upon the ground of undue influence, because it is not properly alleged in the bill. The learned assistant vice chancellor seems to have been of this opinion; for he says "I conceive the bill as radically defective in charging the fraudulent acts in the alternative, upon the son or Lewis, and in charging it to be a mistake or fraud." If it be true that the bill contains no such substantive allegation, then though the proof might warrant the relief sought, it cannot be granted. For it must appear from the bill, as well as the proof, that the plaintiff is entitled to the relief sought. Not, indeed, that any technical form of words is necessary; but such a state of facts must be found in the bill as will lead the court, upon an examination of all its allegations, to draw the inference of undue influence. The terms "undue influence," or "fraud," or "mistake," may not be found in the bill, and yet if either of these grounds of relief is substantially involved in the statements of the bill, relief will not be denied, for the want of proper allegations.

Testing the sufficiency of the allegations in the bill by this rule of pleading, I think they will be found to warrant the relief sought. The plaintiff alleges that being advanced in years, and of delicate and infirm health, and with a view and for the purpose of relieving himself, as far as practicable, from the cares, labors, anxieties and responsibilities connected with and growing out of the conducting and carrying on of his farm, and having perfect confidence in his son and Lewis, he consented and agreed with them to make the conveyance; that the deeds were devised and contrived by Lewis and his son, and drawn under their directions; that, at the time, he was very infirm and feeble both in mind and in body; that he had always been a farmer, was illiterate and easily imposed upon; that he supposed his son and Lewis to be his friends, and trusted implicitly to their instructions and directions; that he was informed and believed, at the time he executed the conveyance, that such conveyance, together with the deed from James to Lewis, and

Brice *v.* Brice.

a certain bond executed by Lewis to James, were intended and designed, and had no other effect, than to create the trusts mentioned in the bill, and that these instruments were all essential and necessary to create such trusts; that he relied upon the information given him at the time by James and Lewis, and believed that the effect of the transaction was to create the trusts specified; that the effect of the instruments was not what he designed and intended it should be, but on the contrary they were either executed through the mistake or misapprehension of the parties, or else James R. Brice and Sebastian Lewis procured them to be drawn and executed fraudulently and for the purpose of deceiving the plaintiff and obtaining from him his property by fraud and deceit, and without any other consideration than his support and maintenance.

This brief review of the statements in the bill shows, I think, a state of facts from which it may justly be inferred that the plaintiff, when he executed the conveyance, was entirely in the power and keeping of his son, and that this influence was exerted with a view to the advantage of the son, and in a manner ruinous to the plaintiff. The question then arises whether, when the facts alleged in the bill are sufficient to justify the inference of undue influence, and the proofs sustain the allegations, relief shall be denied because the plaintiff, in stating his case, has averred that the transaction of which he complains occurred through mistake or misapprehension, or by fraud and deceit? I think not. If the whole case made by the bill and sustained by the evidence shows that the plaintiff, through his own misplaced confidence, has been imposed upon, he is entitled to the appropriate relief, notwithstanding he may have erred in designating the ground upon which he claims such relief, as mistake or misapprehension or fraud, when it should have been called *undue influence.* Pleadings in equity have never been construed by rules so technical. It is enough that an examination of the whole bill furnishes statements which make a case for relief, whatever *misnomer* it may contain in relation to the head of equitable jurisdiction to which the case belongs.

The next question in the case relates to the deed of the 21st

of December, 1833, from the plaintiff to Lewis.   This deed, too, I am satisfied was improperly obtained from the plaintiff.   The account given of this transaction in the testimony is, that James had been indicted for perjury and was then in jail; that he had found some difficulty in obtaining bail; that Lewis went to the plaintiff and told him that Mr. Wheaton would unite with him in becoming bail for James if he would give to him (Lewis) a warranty deed of his farm free from all the restrictions and reservations contained in the trust deed; that the plaintiff " seemed to feel bad and did not say any thing for a while ;" that one Hilton, who accompanied Lewis, then spoke and told him that what Lewis had said was true; that the plaintiff then inquired whether James knew of their coming, and whether *it was his request* that he should give the deed; that Lewis then assured him that he came at the request of his son, and that the deed was only for the appearance of James at court, and would be given up if he stood his trial; that the plaintiff then consented to give the deed, and came to Albany for that purpose.   Mr. Wheaton testifies that the plaintiff came to his office and told him he had sold his farm to Lewis, and requested him to draw the deed; that he stated the terms of the sale, though he could not recollect what they were; that he inquired of the plaintiff why he did not endeavor to save his farm by raising money on a mortgage; to which he replied that the farm would have to go, and it might as well go then as at any other time; that he remonstrated with him against disposing of his farm entirely, but he insisted on the deed being drawn, and he accordingly drew the deed, and went with the plaintiff to a commissioner to have it acknowledged ; and that the deed was subsequently delivered to Lewis.

I have not deemed it necessary to examine the point urged by the counsel for the plaintiff, that the declarations of the plaintiff to Mr. Wheaton cannot be received in evidence, on the ground that they were privileged communications.   I am inclined to think, with the assistant vice chancellor, that they are not within the rule in relation to such communications.   But in the view I have taken of the effect of this evidence, the result

Brice v. Brice.

would not be varied by receiving or rejecting this part of Mr. Wheaton's testimony. Strong and unequivocal as is his testimony as to what occurred at the time the deed was drawn, I cannot resist the conclusion, from all the evidence in the case, that whatever may have been said by the plaintiff to Mr. Wheaton, the deed was in fact executed upon an understanding that it should be cancelled in case James should protect his bail by appearing for trial at the proper time. At any rate I am satisfied that this was the understanding of the plaintiff; and if Lewis designed that the deed should have any other effect, he fraudulently concealed such design from the plaintiff. Lewis had gone to the old man with the sad tidings that his son had been indicted and was then in prison. He was told that he could release him from that imprisonment by giving Lewis an absolute warranty deed of his farm. Was this true? Had Mr. Wheaton required such a deed as a condition of his becoming bail for James? There is no allusion to it in Mr. Wheaton's testimony; and I therefore infer that the pretence that such a deed was necessary to procure bail for James, was a *false pretence*, invented by Lewis for the purpose of more effectually consummating his fraudulent designs. When he found that the plaintiff hesitated to surrender his last means of support, he urged the consideration that he had come at the request of his son, and finally assured him that if James stood his trial the deed would be given up. If the plaintiff was made to believe that the release of his son depended upon his giving Lewis "a new warranty deed free from all the restrictions and reservations contained in the former deed," he might also have been made to believe that his purpose to assist his son would be defeated, if he disclosed to Mr. Wheaton the assurance he had received, that the deed should become inoperative if the bail of James should be protected. This may account for the otherwise singular pertinacity with which he insisted, while at Mr. Wheaton's office, upon divesting himself entirely of all interest in his farm. This view of the transaction derives some confirmation from the fact stated by Mr. Wheaton, that no bargain was made, nor was any money paid at his office, nor in-

deed does it appear that Lewis was at the office of Mr. Wheaton at all with the plaintiff. The fact, too, that it appears that on the same day the deed was given, Mr. Wheaton became bail for James upon the indictment, leads almost irresistibly to the conclusion that there was some connexion between the two transactions.

The subsequent conduct of the parties seems also to sustain the position of the plaintiff, that the deed of the 21st of December was not intended to operate as an absolute conveyance ; or at least that it was not so understood by the plaintiff. It appears that a few days after the execution of the deed Lewis advertised the property, both real and personal, for sale. Upon being informed of this, the plaintiff became alarmed, and called upon the overseers of the poor of the town and stated to them that he had executed a deed to Lewis, *supposing it was a deed of trust to be held by him as long as he was security for the appearance of James at court ;* and wanted to know if something could not be done to save out of the property enough for his maintenance. They went with the plaintiff to Albany and consulted several lawyers. The result was that a notice was prepared and posted at the principal public places in the town, cautioning all persons against purchasing the property of Lewis, on the ground that his pretended title was fraudulent. This notice was given on the 15th of Jan. 1834, and purported to have been signed by the plaintiff. It is true that afterwards, when Lewis had caused one of the overseers to be arrested for forgery committed in signing the name of the plaintiff to the notice, the plaintiff denied having authorized the use of his name, and stated that the title to the property was in Lewis. This occurred in March, and about the time James was to be tried upon the indictment against him. And I cannot but indulge the suspicion that the same influences which had operated upon the plaintiff's mind to induce him to execute the deed, were employed with similar success to induce him to disclaim his agency in the publication of the notices, and to affirm the conveyance to Lewis. It is in this way alone that I can satisfactorily account for the conduct of the plaintiff.

I do not propose to examine, in detail, the evidence in relation to the subsequent conduct and declarations of Lewis. It is proved that shortly after the conviction of James, he told Charles Wands that the plaintiff had given him the deed to procure bail for James; that the deed had been placed in the hands of Squire Wands, and now that James was in the state prison, it ought to be given up. The deed was in fact deposited with Squire Wands, and remained there until his death. *Joseph Wands* testifies to a conversation between Lewis and Squire Wands, at which he was present. He thinks it was the winter after James R. Brice went to state prison. He says Squire Wands asked him what should be done with the deed; and expressed the opinion that if James R. Brice lived to come out of prison, it ought to be given up to him; and if not, to his heirs. In the spring of 1835, Lewis told Dr. Lloyd, when speaking of a suit he had brought against him in relation to some oats that had been bid off by him at an auction sale upon the farm, that he had merely acted as the agent of the plaintiff, and that the farm had been conveyed to him so that he might become bail for the appearance of James at court. These declarations, whatever their effect might be, if unsupported by other evidence, are so fully corroborated by all the circumstances attending the transactions to which they relate, that I have no hesitation in saying that the plaintiff has proved substantially the allegations in his bill in respect to the deed of the 21st of December, 1833; and that this deed, as well as those of the second of January, ought to be declared void as between the plaintiff and the defendant Sebastian Lewis.

The next question in the case relates to the deed from James R. Brice and Sebastian Lewis to Sebastian Gunsolus, for one hundred acres of the farm, executed on the 12th day of February, 1834. The plaintiff insists that this deed, though absolute on its face, was in fact intended to be a security for the moneys which Gunsolus might advance in satisfaction of the mortgage upon the farm. On the other hand, the defendants aver that the sale of the one hundred acres to Gunsolus was absolute, and that he paid therefor the full amount of the $3000, ex-

Brice v. Brice.

pressed in the deed as the consideration of the purchase; of which sum about $1975 was applied to the payment of the amount due upon the mortgage, principal, interest, and costs

The answer is silent as to the manner in which the balance of the purchase money, beyond the amount of the mortgage, was paid; and it is worthy of remark that there is no proof whatever showing any such payment. Mr. Wheaton, in whose office the deed was executed, has no recollection that any thing was paid at the time. It appears that the amount due upon the mortgage was then unknown, and an obligation was executed by Gunsolus, and witnessed by Mr. Wheaton, whereby he agreed to pay the amount due upon the mortgage and to settle the costs which had been made; but no provision seems to have been made for the payment of any balance which might be due to Lewis after the amount of the mortgage and costs should be ascertained. It also apppears that at the time the deed was executed, Gunsolus executed a lease of the same premises to Lewis, for one year, for a rent of $200, *payable in advance*, which sum is endorsed upon the lease by Gunsolus, as having been paid on the same day, and the receipt is also witnessed by Mr. Wheaton. The fact that no money was paid at the time the papers were executed, and that there was no pretence, at the time, that any part of the purchase money had been previously paid, and that no obligation was taken from Gunsolus to pay any amount beyond the incumbrance upon the farm, taken in connection with the absence of all proof of any payment by Gunsolus, seems to justify the belief that he did not in fact pay any amount, beyond the sum necessary to discharge the incumbrance upon the farm.

But it is not necessary now to inquire what amount was in fact paid by Gunsolus, as the purchase money of the one hundred acres conveyed to him. It is enough, for the present, to say, that he did not by his deed acquire such a title as would entitle him to protection as a bona fide purchaser. There is no principle better established than that to defend a title on the ground of a bona fide purchase, it must be shown that the purchase was made for a valuable consideration, and without

notice of any prior equity. (*Grimstone* v. *Carter*, 3 *Paige*, 421, *and cases there cited.*) It is equally well settled that when a person, other than the vendor, is in possession of land, the purchaser has constructive notice of the rights of the possessor, and takes the land subject to all his equitable claims. The possession of such third person is sufficient to put the purchaser upon inquiry as to the extent of his rights. (*Gouverneur* v. *Lynch*, 2 *Paige*, 300. *Chesterman* v. *Gardner*, 5 *John. Ch.* 29.) In *Buck* v. *Holloway's devisees*, (2 *J. J. Marsh.* 180,) the court say : " The only sensible rule is, that actual residence upon the land is notice to all the world of every claim which the tenant may legally assert in defence of his possession." It appears from the proof, and is not denied in the answer, that the plaintiff at the time of the execution of the deed to Gunsolus resided upon the farm, and continued to reside there until the fall of the same year, when *" he left the premises and went to reside with Lewis at Broadalbin."* It follows, then, that even though Gunsolus became the purchaser of the land absolutely, and in his own right, he nevertheless was chargeable with knowledge of the plaintiff's rights ; and those claiming under his title cannot defend on the ground that he was a bona fide purchaser for a valuable consideration without notice. And, besides, I think this branch of the defence must fail for want of proof that Gunsolus ever actually paid the purchase money for the land conveyed to him.

The last remark is equally true of the title of Van Eps. The bill alleges that Gunsolus conveyed to him the one hundred acres with covenants of warranty, and charges that at the time he received the deed he was well apprized of the plaintiff's rights. The answer denies that when Van Eps took his deed he knew that the plaintiff claimed any interest in the land, and insists that Van Eps is the owner in fee of the premises conveyed to him, and has a perfect right to do therewith as he chooses ; but it is not alleged in the answer that he purchased for a valuable consideration, or that he has ever paid any consideration whatever for the land. Indeed it would seem from the evidence that Van Eps has never claimed that he was en-

Brice *v.* Brice.

titled to protection as a bona fide purchaser, without notice of the plaintiff's equitable claim; but that he has rather relied, for indemnity, upon the covenants in his deed.

I am not satisfied, from the evidence in the case, that the defendant Lewis has ever advanced any thing on account of the plaintiff, beyond the amount received by him upon the sale of the plaintiff's personal property. But as there must be a reference in the case, it may be well to direct that in case he shall claim that he has paid for the plaintiff more than he has received, an account may be stated between them.

The decree appealed from must be reversed, and a decree must be entered declaring the deeds of the second of January, 1833, the deed of the 21st of December, 1833, the deed from Lewis to Gunsolus, and the deed from Gunsolus to Van Eps, severally void as against the plaintiff. The decree must also declare that any of the defendants who have paid any incumbrances existing against the farm at the time it was conveyed by the plaintiff, are entitled to a lien upon the farm for the amount of such payments respectively, with interest thereon. The defendants who have had the use or income of the farm must be charged with the value or amount thereof, with interest. If either of the defendants who has made any payments on account of the incumbrances on the farm is also chargeable with any amount for its use or income, he is to be entitled to a lien upon the farm only for the balance of his advances after crediting the amount due from him for the use or income of the farm. The decree must also provide that an account may be stated between the plaintiff and the defendant Lewis; and if it shall appear that any sum is justly due from the plaintiff to him, he is also to have a lien upon the farm for such amount. Provision should be made in the decree also for stating an account between the defendant Van Eps and the executors of Gunsolus; and any amount found due to Van Eps, upon such accounting, is to be declared to be a legal charge against the estate of Gunsolus. Upon the payment of any balance found due to Van Eps, which shall be a lien upon the farm, he must surrender the possession of the farm to the

plaintiff. It must be referred to Mr. Rhoades to state the several accounts between the parties, upon these principles. The decree is also to contain the necessary directions for carrying into effect its provisions. The plaintiff is entitled to costs as against the defendants James R. Brice and Sebastian Lewis; but as between the plaintiff and the other defendants, neither party is to have costs as against the other.

DELAWARE GENERAL TERM, March, 1849. *H. Gray, Mason, and Morehouse,* Justices.