Mott *v.* Mott.

ANN ELIZA MOTT, by William E. Skinner, her guardian,

*v.*

DAMON MOTT.

1. While a bill should contain averments of the right of the complainant alleged to be attacked, and of the injury thereto inflicted or threatened by the defendant sufficient to invoke the jurisdiction of the court and sustain the relief asked, it is not always necessary that such injury be characterized by technical terms—the acts of a defendant detailed with particularity or proved to the extent specified.

2. If there is in the bill substantial averment or recital of facts which disclose to the defendant generally the grounds of complaint, it will be sufficient on final hearing on pleadings and proofs, in a case where the facts cannot be within the knowledge of the acting party, if the grounds of relief are substantially involved in the statements of the bill and are sustained by the evidence.

3. Conveyances by an aged parent to a child, in consideration of the agreement by the latter to support and provide for the former, are upheld, if the transaction appears to have been free from fraud, and the evidence does not show that confidence has been reposed by the infirm in the stronger, but does show that the parties dealt at arm's length.

4. In all transactions between persons occupying relations, whether legal, natural or conventional in their origin, in which confidence is naturally inspired, is presumed, or, in fact, reasonably exists, the burden of proof is thrown upon the person in whom confidence is reposed to show affirmatively that no deception is practiced, no undue influence used and that all was fair, open, voluntary and well understood.

Mott v. Mott.

5. A deed obtained by a son from an aged mother, who reposed the utmost confidence in him, cannot be sanctioned if confidence has been abused, if there is inadequacy of price, or the inference is plain that advantage has been taken of age and weakness, and the partiality of a parent has been artfully made use of to strip her of her property and reduce her to a state of dependence and want.

6. A court of equity will interfere if the party executing an instrument is weak and liable to be imposed upon, if it finds that any acts or stratagems or any undue means have been used, if it sees the least speck of imposition at the bottom, or if the grantor is in such a situation with respect to the donee as will naturally give an undue influence over her and there is the least scintilla of fraud.

7. It is a fraud on such grantor to misrepresent facts so as to induce the making of a deed, and evidence of fraud that such person was not afforded the opportunity for outside advice; it is also a fraud, where the only consideration for the deed is an agreement on the part of the son to support the mother, not to give to the parent an instrument of equal solemnity with that which he receives from her expressing such consideration.

On final hearing on pleadings and proofs.

*Mr. William E. Skinner,* for the complainant.

*Mr. Henry S. White* and *Mr. Alfred Taylor,* for the defendant.

GREEN, V. C.

Ann Eliza Mott was adjudged a lunatic, with lucid moments, in proceedings in this court, on the 30th day of July, 1889, and William E. Skinner was afterwards appointed her guardian by the Bergen county orphans court.

Mrs. Mott was born in 1819, and was married in 1838 to a widower with one child. She had two children by him, a son, Damon Mott, the defendant, and a daughter, Phoebe, who afterwards married a Mr. Ackerman.

Mr. and Mrs. Mott did not live together for some years. He resided in Connecticut and she at Hackensack, N. J., in a house built by her daughter's husband upon the property in question in this suit, the title of which was in Mrs. Mott. The old lady lived with her daughter and son-in-law, he providing for the house until his business required the removal of his family to

Westchester, where they lived until 1887, when they went to St. Augustine, Florida.

Mrs. Mott continued in Hackensack, occupying sometimes part of her own house and renting the balance, and at other times occupying rooms and renting her house. Her grandson, Charles Ackerman, lived with her, as did her granddaughter, Ella Russell, a part of the time, until she left Hackensack for a year or so, when, having been married to Dr. Russell, she returned to that place. It was arranged, in the year 1887, that the old lady should go to Florida to visit her daughter, on which trip her grandson, Charles Ackerman, was to be her escort. It was delayed at first, as he says, by the fact that he was not able to leave his business, and it appears by the evidence that afterwards Mrs. Mott's husband was seriously ill at his daughter's, Mrs. Van Scivens, in Connecticut, and the old lady, desiring to arrange some matters before his death, went to her stepdaughter's, and remained with her husband until his death, which occurred in the fall of that year. She returned, after her husband's death, to Hackensack, and continued to reside there until the latter part of May or June, 1888, when she went to visit her son, Damon, who lived in Connecticut, prior to going to Florida, which she had again determined to do.

In the summer of 1888 she was the owner of a tract of twelve acres of land in Connecticut, the value of which is not stated; a house and lot in Hackensack, in this state, worth $1,500; certain household effects; an indebtedness of her son, Damon, of $450, secured by a chattel mortgage; a note of Albert C. Bogert for $82 or $100; a note of her son-in-law Ackerman of $19 or $20; a claim against her granddaughter, Mrs. Ella Russell, of $100, and one against her grandson, Charles Ackerman, of over $125; a deposit in the savings bank of $214 and some cents.

It is claimed by her son, the defendant, Damon Mott, that his mother, in the summer of 1888, made over the whole of her property to him, by which she cancelled his indebtedness to her and invested him with the ownership of all her personal property and rights in action and the title to her real estate.

Mott v. Mott.

Deeds from her to him of the real estate in Connecticut and New Jersey, dated respectively August 6th and August 10th, 1888, were executed and placed upon the record.

This suit is brought in the name of Ann E. Mott by William E. Skinner, her guardian, to set aside the deed of the property in Hackensack, on the ground that the defendant fraudulently obtained title to said lands from his mother " by procuring in some way her signature to said paper writing purporting to be a deed ·of conveyance to him of said lands," at a time when she was unable, by reason of mental derangement, unsoundness and imbecility, to comprehend what she was doing, and when what she ·did had made no impression whatever upon her mind, or at some ·other time or by some means induced her to convey said lands ·and premises to him, at a time when her mind was deranged or unsound, or weak, or under an undue influence exercised or ex-·erted by him.

The answer of the defendant denies the grounds stated, as to his mother's mental capacity or weakness or that he fraudulently obtained title to the lands mentioned, and insists that his mother was competent to convey, and that the transfer was made to the ·defendant for a good and valuable consideration, he agreeing to provide her a home and support her during her life, and for her protection to make a will in her behalf.

It is insisted that the complainant must establish that, at the time of the execution of the deed, she was either mentally incompetent or acted under what is technically known as undue influence exerted over her by the defendant.

It is undeniable that relief cannot be granted on proof of facts outside the case made by the pleadings.  But while it is true that the bill should contain averments of the rights of the complainant alleged to be attacked, and of the injury thereto inflicted or threatened by the defendant, sufficient to invoke the jurisdiction of the court and sustain the relief asked, it is not always necessary that such injury be characterized by technical terms—the acts of the defendant detailed with particularity, or proved to the extent specified.  With reference to such acts, if there is in the bill substantial averment, or the recital of facts

which disclose to the defendant generally the grounds of com--
plaint, it will be sufficient, on final hearing on pleadings and
proofs, in a case when the facts cannot be within the knowledge·
of the acting party, if the grounds of relief are substantially
involved in the statements of the bill and are sustained by the·
evidence.    *Outcault* v. *Disborough, 2 Gr. Ch. 214; Mutual Life·*
v. *Sturges, 6 Stew. Ĕq. 328, 337; Goherty* v. *Bennett, 10 Stew:*
*Eq. 87; Whelan* v. *Whelan, 3 Cow. 537, 571; Brice* v. *Brice,.*
*5 Barb. 533, 541; Deatly's Heirs* v. *Murphy, 3 Marsh. (A. K.)·*
*472, 474.*

The general charge in the bill is that the defendant fraudu-
lently procured this deed from his mother.    It is charged to
have been effected either while she was *non compos* or at some
time or by some means when her mind was deranged or unsound.
or weak, ·or by undue influence exerted by him over her.

The peculiar features of this suit are not to be overlooked.
It is not by a party *sui juris,* but in behalf of one who at the·
time of filing the bill must be taken to be *non compos.*    It is·
brought by her legal guardian, who has not, and cannot have,.
knowledge of the peculiar and special phase of fraud adopted.
The bill charges that the complainant was in an enfeebled state·
of mind, either totally or partially imbecile.    These are, how-
ever, but specifications of her mental condition.    The charge is·
the fraudulent procuring of this deed.    That is specifically pre-
sented to the defendant as the act attacked which requires his·
defence.    No surprise can be alleged by him; he is thoroughly
advised that his conduct in procuring this deed from his mother·
at the time and in the manner he did is brought in question and
charged to be fraudulent.    To require particularity of charge in
such a case would be a denial of justice and offering a premium·
to frauds carried out in secret.

The inquisition in July, 1889, found Mrs. Mott of unsound
mind, incapable of the government of herself or her estate, from
January, 1888, a time anterior to the conveyance attacked.    The·
inquisition, however, simply makes a *prima facie* case, and is not
conclusive, against the defendant, even as to the point of time·
when it was taken.    *Hunt* v. *Hunt, 2 Beas. 161; Yauger* v..

*Skinner, 1 McCart. 389; Hill v. Day, 7 Stew. Eq. 150; Runk v. Morgan, 3 Dick. Ch. Rep. 415.*

Whatever mental infirmity Mrs. Mott evidenced prior to the visit made by her to the defendant in 1888, and which will be considered in detail on another branch of the case, it cannot, in the light of the testimony of Judge Donohue and Dr. Eldridge, and the other witnesses as to her mental condition, at and about the time of the execution of the deed, be said that she did not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act she was engaged in, which is the test in such cases if unmixed with fraud. *Hill* v. *Day, 7 Stew. Eq. 150; Earle* v. *Norfolk &c. Co., 9 Stew. Eq. 188; affirmed, 10 Stew. Eq. 315; Eaton* v. *Eaton, 8 Vr. 109.* The complainant's attack on this conveyance solely on the ground of lunacy must fail.

Conveyances by an aged parent to a child, in consideration of the agreement by the latter to support and provide for the former, are upheld if the transaction appears to have been free from fraud and the evidence does not show that confidence has been reposed by the infirm in the stronger, but does show that the parties dealt "at arm's length." '*Collins* v. *Collins, 18 Stew. Eq. 813.*

Another principle, however, is to be applied when confidence has been reasonably reposed between the parties which may have been abused.

In *Low* v. *Holmes, Dru. t. Nap. 290* (at *p. 320*), the lord chancellor says : "It is not the duty of this court, and it may not be within its province, to rectify in all cases the various inequalities of contracting parties, or to undo the advantage which may be gained by the strong or sagacious over the weak and improvident, but in every relation which induces confidence and involves dependence it is the bounden duty of this court to see that such confidence is not abused."

In *Sears* v. *Shafer, 6 N. Y. 268* (at *p. 272*), Gridley, J., says : "A court of equity interposes its benign jurisdiction to set aside instruments executed between persons standing in the relation of parent and child, guardian and ward, physician and patient,

solicitor and client, and various other relations in which one party
is so situated as to exercise a controlling influence over the con-
duct and interest of another.    In some cases undue influence will
be inferred from the nature of the transaction alone, in others
from the nature of the transaction and the exercise of occasional
and habitual influence."

In *Cowee* v. *Cornell, 75 N. Y. 91–99,* Hand, J., says : " It
may be stated as universally true that fraud vitiates all contracts,
but as a general thing it is not presumed but must be proved by
the party seeking to relieve himself from an obligation on that
ground.   Whenever, however, the relations between the con-
tracting parties appear to be of such a character as to render it
certain that they do not deal on terms of equality, but that either
on the one side from superior knowledge of the matter derived
from a fiduciary relation, or from overmastering influence, or on
the other from weakness, dependence, or trust justifiably reposed,
unfair advantage in a transaction is rendered probable, there the
burden is shifted, the transaction is presumed void, and it is
incumbent upon the stronger party to show affirmatively that
no deception was practiced, no undue influence was used, and
that all was fair, open, voluntary and well understood."

The principle applies, and the rule of evidence is enforced in
all transactions between persons occupying relations, whether
legal, natural or conventional in their origin, in which confidence
is naturally inspired, is presumed, or in fact reasonably exists.

" It is that great rule of the court that he who bargains in a
matter of advantage with a person placing confidence in him, is
bound to show that a reasonable use has been made of that con-
fidence—a rule applying to trustees, attorneys, or anyone else."
Lord Eldon, in *Gibson* v. *Jeyes, 6 Ves. 266, 278.* " The prin-
ciple applicable to the more familiar relations of this character
have been long settled by many well-known decisions, but the
courts have always been careful not to fetter this useful condi-
tion by defending the exact limits of its exercise." Lord
Chelmsford, in *Tate* v. *Williamson, L. R. (2 Ch. App.) 55, 61.*
" The jurisdiction is founded on the principle of correcting
abuses of confidence, and I shall have no hesitation in saying it

ought to be applied, whatsoever may be the nature of the confidence reposed or the relations of the parties between whom it had subsisted. I take the principle to be one of universal application, and the cases in which the jurisdiction has been exercised, those of trustee and *cestui que trust*, guardian and ward, attorney and client, surgeon and patient, to be merely incidents of the application of the principle." V. C. Turner, in *Billage* v. *Southee, 9 Hare 439, 440.*

Equity assumes that instruments creating estates in favor of a party standing in certain confidential relations with a person from whom the interest is obtained, are made under conditions of confidence and trust inspired by the relation, and will either absolutely avoid the transfer on the application of the alienor, or throw the burden of proof on the alienee to establish the good faith of the transaction. Dealings between trustee and *cestui que trust* are illustrations of this. When a controlling influence is not conclusively inferred from the character of the relation, it may be necessary to prove that confidence was in fact reasonably reposed by the one in the judgment, sincerity and honesty of the other, but the relation and confidence established, the burden of proof is on the person in whom confidence is placed to prove the entire fairness of the bargain.

The relations we have to consider as existing between the parties in this case are those of principal and agent, and parent and child.

In *Farmer's Exrs.* v. *Farmer, 12 Stew. Eq. 211* (at *p. 216*), Vice-Chancellor Van Fleet says: "A contract made by an agent with his principal in relation to the subject-matter of the agency, will not be allowed to stand unless it appears that it is entirely free from undue influence, advantage and imposition. The transaction must be characterized by the utmost good faith, and the burden of establishing the perfect fairness of the contract is on the agent;" citing *Condit* v. *Blackwell, 7 C. E. Gr. 48; Porter* v. *Woodruff, 8 Stew. Eq. 174.*

With reference to transactions between parent and child, the law presumes that the influence of the parent over his child, during the tender years of infancy, is so controlling that it regards

transfers from the child to the parent, on arriving at majority, or immediately thereafter, as having been made under the influence of over-weening confidence. As the child matures and acquires experience and independence the presumption weakens and at last ceases. As the parent, however, advances in years, the condition of dependence may be reversed by the hand of time. If life draws to a close with a failing intelligence and enfeebled frame, the parent naturally looks with confidence to a son or daughter for advice and protection. The parent becomes the child, "with the same dependence, over-weening confidence and implicit acquiescence" which had made the other, in infancy, the willing instrument of the parent's desires. *Highberger* v. *Stiffler, 21 Md. 338 ; Martin* v. *Martin, 1 Heisk. 644, 653 ; Brice* v. *Brice, 5 Barb. 533 ; Comstock* v. *Comstock, 57 Barb. 473 ; Whelan* v. *Whelan, 3 Cow. 557 ; 2 White & T. Lead. Cas. (4th ed.) 1206.*

. If, under such circumstances, a son obtains a conveyance from a parent, this court will not permit it to stand unless such son establishes by abundant proof that the contract was not only free, but fair, and made with the utmost good faith.

Under what conditions was the deed of the Hackensack property executed, with reference to the degree of trust and confidence reposed in the defendant by his mother?

We enter on this inquiry not with a view of ascertaining if that extreme control which characterizes what is technically known as "undue influence" existed, but whether Mrs. Mott, when executing this deed, placed such confidence and reliance in her son that the burden of proof is thrown upon him of showing that such confidence was not abused.

The deed is dated August 10th, 1888, a little over two months after her arrival at her son's house.

While, as stated before, the evidence of the defendant's witnesses must be taken as establishing that, at the time of the execution of this deed, she must be considered as competent, under the authorities, to make a valid conveyance of her property, it is necessary, in considering the question of what influence may have been exercised over her by her son, to examine a little in detail

Mott v. Mott.

·the evidence with reference to her mental condition prior to her visit to his house.

She appears to have been a lady of average mental force, of much independence of character and of good physical health, until about the year 1880, when she had the misfortune to meet with an accident at the house of a Mr. Bogert.  The immediate effect of this, a fall, was the breaking of two ribs and an injury to her spine; the subsequent result was neuralgia or headache, dullness, inattention and forgetfulness.  Her condition of mind after the fall has been described by her friends, neighbors and relatives in Hackensack as one of increasing physical and mental weakness.  There is evidence showing that she had the usual forgetfulness of people's names, a common incident of advancing .age.  But, connected with this, there was difficulty in making herself understood; she seemed to lose, to a certain extent, the .ability of conveying her ideas about ordinary matters to those ·with whom she was conversing.  Loss of memory was indicated ·by the fact that, on several occasions, she lost her way in the ·streets at Hackensack, where she had lived for years, and with which she must necessarily have been familiar.  Her mind seems to have been subject to unreasonable fancies, imagining at one time that the sermon of the minister had been especially directed .to her, and causing her much religious anxiety; she was constantly impressed with the idea that some one was robbing her .of her vegetables, wood and coal, although she had them securely placed under lock and key, and supposed that people were con- ·spiring to turn her out of her lodgings and put her and her belongings on the street; notwithstanding she was possessed of ·comfortable means and in no ways impoverished, she begged money from the church deacons, and on one occasion cried because she had not been asked to go to a children's Sunday school picnic.

These infirmities, while they may not have culminated in a ·degree of imbecility which would render her incompetent to ·convey, show that her mind was in a condition of susceptibility to influence if sought to be exerted by one who had her confidence or affection.

The evidence, I think, shows two prominent traits of character of Mrs. Mott prior to the time in question—one, affection for her children; the other, the tenacity with which she kept control of her own property. She would loan them money liberally, with reference to her means, but she always held them as debtors to the amount of her advances. According to the defendant's statement, it was a favorite expression of hers "that she would keep the loaf under her own arm."

When Mrs. Mott went to visit her son in May or June, 1888, it was with the firm intention of staying there but a short time, and then of going to Florida to stay with her daughter.

When she went to Connecticut there was no lack of love for her daughter and family, and no doubt of their affection for her, for it would seem from the evidence that it was her intention to make the visit to her daughter a permanent change of residence.

That the defendant had a controlling influence over her in her condition, and that she reposed the utmost confidence in him, is, I think, shown from the history of her visit to him, from the very moment she arrived there. At his suggestion she changed her plans of going shortly to Florida, Damon promising her to take her there after he was through his haying. There is serious question whether he ever intended so to do, and whether this was not a pretext used by him to more easily induce his mother to change her plans. The business he was engaged in is one which would not permit any extended absence from it. It was so engrossing upon his time that he could not absent himself from it in order to meet his old mother, sixty-eight years of age, at the Hartford boat, at four o'clock in the morning, but left her to the escort of a man from the livery stable.

He played upon her sympathies and affection by telling her that if she went away from him she would never see him alive again, and although the daughter in Florida wrote affectionately to her, and offered to pay her passage to St. Augustine, she finally, under the persuasion of the defendant and those about him, abandoned her visit to her daughter altogether and determined to live with her son.

It appears that she executed to him during this summer two powers of attorney. What they were we do not accurately know, except that they were powers of attorney which he had prepared and which he procured her to execute. We have little or no evidence as to the circumstances under which they were given, and we have no legal evidence as to the extent of their authority. These papers were in the possession of the defendant, and were not produced upon the trial; they were important pieces of evidence, which would throw much light upon the question involved. The defendant cannot complain if presumptions are indulged in with reference to the contents of these papers so withheld by him, which may be unfavorable to his case. If they were absolute and unqualified powers of attorney, they are plenary evidence of the utmost confidence and reliance reposed by his mother in him; if they did not go to that extent, but were limited in their scope, they are still strong evidence of such confidence, and, to the extent of the power, constituted him her agent as to her property covered by their provisions.

With these powers of attorney he went to Hackensack and took charge and possession of all her property which he was able to find, and returned to his mother and poured into her ears stories by which her love for her daughter was turned to suspicion and distrust, and she was induced to believe that her daughter and family intended to rob her.

If the defendant is to be believed, she thereupon and for that reason determined to divest herself of all her property and transfer it to him. She had for years lived with her daughter and had never, so far as appears, had reason to doubt her filial love or perfect loyalty to her interests. The husband had built the house upon her land and had given her a home without expense so long as they lived at Hackensack, yet without investigation or inquiry, on the mere word of her son, she formed the idea that her daughter intended to rob her. The two traits of her character which had manifested themselves so prominently— affection for her daughter and the retention of her property—lose their control of her action, and through some influence she does an act which does violence to both characteristics. No one but

the defendant was by with advice, no influence save his was exercised, no friend but he consulted, in whom confidence was reposed.

There could be no stronger evidence of influence exercised by an only son over his mother, an old lady in the mental condition of Mrs. Mott, than to thus find that under his inspiration the whole current of her life is changed; a mother's love and confidence in an only daughter replaced by aversion and distrust, her cupidity first awakened to arouse suspicion of the daughter's honesty, and then put to sleep by entire reliance in the integrity of the son. The conveyance being made at a time when confidence was thus placed in him by his mother, and when he, holding her power of attorney, was her agent, the burden of proof is doubly thrown upon him to show that her confidence was not abused, that this transaction was in all respects fair and that it is unmixed with any fraud.

How has he met this requirement?

He was examined as a witness in his own behalf. That no injustice be done him his statement is given in his precise language. In answer to the direction of his counsel to state "all that occurred and the circumstances leading up to the execution of this deed, beginning at the beginning," he says:

"Well, the first start after that deed, was my going to Hackensack to get that furniture and the goods of mother's; I went there and was told part of her goods had been sent to St. Augustine; as I packed up what I could and sent to mother or shipped them, put them on the platform at the depot, I went up and I told mother that they have sent all your papers and all your valuables south, and she said she could not see what right they had to deprive her of her property, or something similar to it; all I want to convey in that way, and after that in our conversation she said, they are trying to rob me and they have been robbing me, and whether there was anything said about it that day or not, but finally it came out about the deed and it was talked of; finally, after mother had made up her mind to give me the deed to that property, I said 'If you do, I will make my will and will you all my property, the whole of it, so that you may be protected if I drop dead.'

"Q. What was said about your caring for your mother as long as she lived?

"A. It was understood that she was to make her home with me and live with me as long as she lived.

"Q. Any agreement?

"*A*. There was no agreement; all the agreement there was, was about my making that will.

"*Q*. What agreement was made between you and your mother about keeping her as long as she lived?

"*A*. The agreement was I was to provide for her; provide for her and furnish her a home.

"*Q*. Without charge?

"*A*. Without charge as long as she lived; the first agreement was that I would make my will and I would provide for her and do for her and give her a home as long as she lived."

Asked what was said about the provisions of the will, he says :

" Well, I told you the afternoon that that deed was signed we had not made up our minds upon what form so as to cover everything, and he knew it was going—that is, I mean to make a will, and so he says you wait and make up your mind how that will wanted to be drew and come in here and we will have it executed."

This is his statement of the agreement on his examination in chief, and it appears to be limited on her part to the deed in question. The agreement, as stated in his answer, embraced on her part not only this deed but "certain other minor personal property " and the release of any claims she might have against him, while on cross-examination he claims that it covered everything she owned, including furniture. Any idea of advancement is eliminated from the case by the answer and by his testimony. He puts it solely on the ground of contract, and claims the conveyance for a good and valuable consideration. He is the only possible witness to the making of that contract; he gives his testimony knowing that there is no one to contract him; he gives it with full knowledge of what he is required to show, and that he is confronted with the duty of proving the entire fairness of this transaction; yet there is the merest fragment of the conversations which led up to the deed, a denial until the suggestive question of his counsel as to his agreement to support, no statement as to what his mother in terms agreed to turn over to him, no evidence of any estimate by her of the value of what she was parting with, not a word about his indebtedness to her, no specification of what she was to receive. The story impresses the

mind with the belief that the old lady, angered at the thought that her daughter was trying to despoil her, yielded to his solicitation to convey everything to him. The will was an afterthought, as abundantly appears.

This case involves only the Hackensack property, but in the investigation of the question of abused confidence and fraud, we are to look not only at the deed and its execution but to the whole transaction. *Huguenin* v. *Baseley, 14 Ves. 273.* We accept his statement as to what was embraced in the agreement.

He has, according to his own account, stripped the old lady of every vestige of property, for he says the transfer included even her furniture, for an agreement that he would maintain her during the remainder of her life. The discharge of the duty of a son to the mother who bore him, and which one would suppose he would be only too glad to perform, is the only consideration for the transfer of real and personal property sufficient in value to have secured what would have been to her a luxurious home. What was the "care, support and maintenance" she was to receive? Not to ascertain if there has in fact been a failure of consideration, but to test the fairness of the transaction. He claims he gave her what he bargained to until she went away, and that he stands ready to continue so to do. What he intended to give her is thus to be ascertained by what she got. Judged by that standard did he impose upon his mother in this bargain? Without female help or female associations, she was placed in charge of his house, cooked his food, mended his clothes, became the merest drudge, doing everything but the washing, and really earned all she received as the consideration of the transfer of her property. No woman was brought in as a help until the weather grew so cold that fires had to be started.

In February she was stricken with an alarming illness, from which it was doubtful at one time if she would recover. She rallied from the disease, but her mind was well-nigh gone. There is no question raised as to her childishness and helplessness after this attack. The time had come when she needed care, comfort, companionship. The period had arrived when his bargain would not be profitable. It is true defendant had a house-

Mott v. Mott.

keeper, but what was the home he gave his now helpless mother in consideration for the transfer to him of all her property? The condition in which her daughter and friend found her in the spring of 1889 was truly pitiable. Mrs. Ackerman describes her as being at ten o'clock in the day without as much as a morning wrap on, nothing but her night dress, in the sitting-room not yet put to rights, with enough of mind left to recognize her daughter, to revive her old affection, and to realize her condition of dependence and poverty; her first impulse was to get away from her present surroundings and go with her daughter, when the remembrance that she had no money to go with seemed to blast that desire and she cried like a child. This eagerness to escape from her environments, this grief when it seemed impossible, leave but little doubt as to the neglect she had experienced, while the scanty traps they were able to collect demonstrated the condition well-nigh of want her son had permitted her to endure. If he has kept his contract and given her what he agreed to, it seems useless to ask, was this a fair bargain for a son to make with his mother, of advanced years, of intellect susceptible to influence, who placed implicit confidence in him? Was he careful that she, who trusted him, was to receive an ample equivalent for that she was to part with? That was his duty under their relations considering her confidence. Was it a contract he could have secured from a stranger? That is the test when he is considered as her agent. *Hunter* v. *Atkins*, *3 Myl. & K. 113, 135.*

As is said in *Whelan* v. *Whelan, 3 Cow. 537* (at *p. 572*), "A contract obtained from one party, so much in the power of the other, cannot be sanctioned, if confidence has been abused, if there is inadequacy of price, or the inference is plain that advantage has been taken of age and imbecility, and the partiality of a parent has been artfully made use of to strip him of his property, and reduce him to a state of dependence and want."

Not only does the defendant fail when put to the test to show that his mother's confidence in him was not abused, and that everything was perfectly fair and reasonable in all its terms, but it seems to me the case falls within that where the court will

interfere if the party executing an instrument is weak and liable to be imposed upon; if it finds that any acts or stratagems, or any undue means, have been used; if it sees the least speck of imposition at the bottom, or that the grantor is in such a situation with respect to the donee as may naturally give an undue influence over him, and there is the least scintilla of fraud. *Bridgman* v. *Green, 2 Ves. 627; S. C., Wilm. 58; Cowee* v. *Cornell, 75 N. Y. 91, 101, 102; Lord Donegal's Case, 2 Ves. 407; Huguenin* v. *Baseley, 14 Ves. 273; Whelan* v. *Whelan, 3 Cow. 538.*

The evidence already considered establishes her enfeebled condition, the influence exercised, the confidence reposed, and the advantage taken. There are also evidences of fraud in the transaction to be gathered from the testimony.

1. *Misrepresentation.*—There was nothing as ascertained by defendant on his visit to Hackensack that could justify a report which could effect such change of feeling on the part of his mother, and cause her to believe that her daughter wanted to rob her. The grandchild, Charles, who remained in Hackensack, in carrying out the original intention of her going permanently to Florida, had, on receiving word which he believed to be instigated by the defendant, sent her things, including her valuables, to St. Augustine, justifying what he did by saying that he did not consider the giver of a chattel mortgage should be its custodian, and it is a serious question whether Charles was not right in his judgment, but however this may be, it was not the act of the daughter; her letters from the south immediately acknowledged the receipt of these things, and stated that they are to be taken care of and held subject to her mother's orders. Defendant's taking advantage of his mother's change of feeling towards her daughter, produced by his unjustifiable statement to procure conveyance of her property to him, was a fraud.

2. The transfer of her property was made without opportunity for her to have outside advice. The deed was prepared by the procurement of the defendant. He sent to Hackensack and had it prepared and took his mother to Judge Donohue to have it executed. Judge Donohue was and had for years been his coun--

Mott v. Mott.

sel, but even he was not called in to advise the old lady.  His part of the transaction seems to have been that of explaining the effect of the deed and taking her monosyllabic replies to his formal inquiries.  *Sears* v. *Shafer, 1 Barb. 408; Owing's Case, 1 Bland 392.*

3. It was a fraud for him to permit his agreement to support his mother, the only consideration for this conveyance, to rest in parol.  The will was a makeshift; it was not delivered to her or anyone for her; it was subject to his control; he produced it on the trial; he could at any moment have revoked it.

The question has not arisen in this state in any reported case, but there are well-considered cases in other jurisdictions which hold that where a deed, made by a parent to a child on such an agreement, expressly states it as the consideration of the conveyance, on failure to perform by the child, a court of equity will, on proper pleadings, set aside the agreement and conveyance and do equity between the parties, some on the ground of the recision of a contract for fraud as the converse of specific performance, others on the ground of a condition subsequent.  *Reed* v. *Burns, 13 Ohio St. 49; Jenkins* v. *Jenkins, 3 Mon. 327; Leach* v. *Leach, 4 Port. (Ind.) 628; Scott* v. *Scott, 3 B. Mon. 2; Yoakum* v. *Yoakum, 77 Ill. 85; Devereaux* v. *Cooper, 11 Vt. 103; Bogie* v. *Bogie, 41 Wis. 209; Bresnahan* v. *Bresnahan, 46 Wis. 385; Blake* v. *Blake, 56 Wis. 392; DeLong* v. *DeLong, 56 Wis. 514.*

It is held to be a badge of fraud if such an agreement is a part of the consideration and is omitted from the instrument.  *Sweet* v. *Bean, 67 Barb. 91; Carpenter* v. *Muren, 42 Barb. 300.*

Vice-Chancellor Van Fleet, in *Mulock* v. *Mulock, 4 Stew. Eq. 594* (at *p. 601*), holds that it is a fraud in a son obtaining a conveyance from his aged mother, under conditions to be performed by him, not to see that what she intended to reserve was secured to her as fully and as perfectly as that which she intended to give was granted to him.  Although this case was reversed in part (*S. C., 5 Stew. Eq. 348*), I do not understand that this position of the learned vice-chancellor to be disturbed.

The failure to either insert the agreement in the deed as a statement of the consideration, or make it the subject of a dis-

tinct agreement in writing, was, in this case, a clear fraud. He knew his mother's condition was a failing one. Whatever he may say to the contrary, he had a question as to her mental capacity. No other theory explains his application to Dr. Eldridge to examine the old lady as to her mental condition. He was taking from her all the means of support she had, and it was a badge of fraud not to give her independent evidence of his agreement to support her, which would avail her if her mind gave way or other instruments of evidence should fail.

I am of opinion that the complainant is entitled to a decree setting aside the deed of the property involved in this suit, and so advise.